STEVEN G. KALAR
Federal Public Defender
CANDIS MITCHELL
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:     415.436.7700
Facsimile:     415.436.7706
candis_mitchell@fd.org

Counsel for Defendant Robert Lathen

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **United States of America,**<br><br>    Plaintiff,<br><br>v.<br><br>**Robert Lathen,**<br><br>    Defendant. | Case Number: 15cr00443-WHA<br><br>**Sentencing Memorandum**<br><br>Date:   August 23, 2016<br>Time:  1:30 p.m. |

Robert Lathen, through undersigned counsel, respectfully offers the following memorandum in support of his request for a sentence of 12-months and a day in custody, or, in the alternative five-years probation.

# CASES

*Jacobson v. United States*, 503 U.S. 540, 548 (1992) ........................................................ 18, 20

*Mathews v. United States*, 485 U.S. 58, 63 (1988) ................................................................... 18

*Sorrells v. United States*, 287 U.S. 435 (1932) ............................................................ 17, 19, 20

*United States v. Bala*, 236 F.3d 87, 90-92 (2d Cir. 2000) ....................................................... 21

*United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999) ........................................... 20

*United States v. Brand*, 467 F.3d 179, 189- 195 (2d Cir. 2006) .............................................. 18

*United States v. Brooks*, 215 F.3d 842 (8th Cir. 2000) ...................................................... 18, 19

*United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991) ..................................................... 19

*United States v. Fedroff*, 874 F.2d 178 (3d Cir. 1989) ...................................................... 18, 19

*United States v. Gamache*, 156 F.3d 1, 9-10 (1st Cir. 1998) ................................................... 20

*United States v. Garcia*, 182 F.3d 1165, 1168-69 (10th Cir. 1999) ......................................... 18

*United States v. Gurolla*, 333 F.3d 944, 955 (9th Cir. 2003). ................................................. 20

*United States v. Hollingsworth*, 27 F.3d 1196, 1198 (7th Cir. 1994 ........................................ 18

*United States v. Hsu*, 364 F.3d 192, 200 (4th Cir. 2004) ................................................... 18, 19

*United States v. Johnson*, 872 F.2d 612, 620 (5th Cir. 1989) .................................................. 19

*United States v. Kelly*, 748 F.2d 691, 698 (D.C. Cir. 1984) .................................................... 19

*United States v. Kussmaul*, 987 F.2d 345, 348 (6th Cir. 1993) ............................................... 18

*United States v. LaRizza*, 72 F.3d 775, 778 (9th Cir. 1995) ................................................... 19

*United States v. McClelland*, 72 F.3d 717 (9th Cir. 1995) ...................................................... 21

*United States v. McKinley*, 70 F.3d 1307, 1311-14 (D.C. Cir. 1995) ...................................... 18

*United States v. Nations*, 764 F.2d 1073, 1080 (5th Cir. 1985) .............................................. 19

*United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir. 1986) ........................................... 18, 19

*United States v. Poehlman*, 217 F.3d 692, 697 (9th Cir. 2000) ............................................... 18

*United States v. Polanco*, 634 F.3d 39 (1st Cir. 2011) ........................................................... 13

*United States v. Posner*, 865 F.2d 654 (5th Cir. 1989 ........................................................... 20

*United States v. Pratt*, 913 F.2d 982, 989 (1st Cir. 1990) ...................................................... 19

*United States v. Ramos*, 462 F.3d 329, 334-35 (4th Cir. 2006) ............................................... 20

Defendant's Sentencing Memorandum
15cr00443-WHA

*United States v. Russell*, 411 U.S. 423, 430-35 (1972) ............................................................ 17, 18

*United States v. Santillanes*, 274 Fed.Appx. 718 (D.N.M. Sept. 19, 2009). ................................ 17

*United States v. Sligh*, 142 F.3d 761 (4th Cir. 1998) .................................................................. 18

*United States v. Tom*, 330 F.3d 83, 89-91 (1st Cir. 2003) ............................................................ 17

*United States v. Warren*, 16 F.3d 247 (8th Cir. 1994) ................................................................. 21

*United States v. Warren*, 453 F.2d 738 (2d Cir.), *cert. denied*, 406 U.S. 944
    (1972) ............................................................................................................................... 20

*United States v. Wise*, 221 F.3d 140, 154-56 (5th Cir. 2000) ..................................................... 18

*United States v. Wright,* 921 F.2d 42, 45 (3d Cir. 1990) ............................................................. 20

**OTHER AUTHORITIES**

Combat Methamphetamine Epidemic Act of 2005, Pub. L. No. 109-177,
    tit. VII, 120 Stat. 256 (2006) ............................................................................................ 14

DEA Intelligence Division Report chart of 2013, available online at
    https://www.drugabuse.gov/sites/default/files/files/cewg_january_2013
    _vol1_508.pdf ................................................................................................................. 14

James J. Cunningham et al., *Mexico's Precursor Chemical Controls:
    Emergence of Less Potent Types of Methamphetamine in the United
    States*, 129 Drug & Alcohol Dependence 125, 126 (2013) *available at*
    http://www.ncbi.nlm.nih.gov/pubmed/23127541 ............................................................. 14

Nat'l Drug Intelligence Ctr., U.S. Dep't of Justice, Publ'n No. 2010-Q0317-
    001, *National Drug Threat Assessment 2011* 23 (2011), *available at*
    https://www.justice.gov/archive/ndic/pubs44/44849/44849p.pdf. ...................................... 14,15

Sentencing Commission at "Methamphetamine, Final Report 1999," pages
    7-13; available online at
    http://www.ussc.gov/sites/default/files/pdf/research/working-group- ............................... 13, 16

http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testi
    mony_and_Reports/Drug_Topics/200205_RtC_Cocaine_Sentencing_
    Policy/ch2.pdf.................................................................................................................. 13, 14

**RULES**

U.S.S.G. § 2D1.1 Application Note 8(D) ...................................................................................... 13

U.S.S.G. § 2D1.1(c)(11)................................................................................................................ 12

U.S.S.G. § 2D1.1(c)(8)................................................................................................................. 12

1

2

3

**1.      Section 3553(a) Analysis**

**1.1.      The Nature and Circumstances of the Offense . . .**

On April 22, 2016, Mr. Lathen pled guilty to counts one and two of the Indictment charging him with a non-minimum mandatory offense of Possession with Intent to Distribute and Distribution of Methamphetamine.

In June 2014, an initiative was launched in the Bayview/Hunters Point area of San Francisco to identify and arrest drug traffickers. *See* PSR ⸀ 6. Mr. Lathen was unfortunately one of many caught in the fray. During the course of the investigation, a confidential informant ("CI") approached the agents and said that she met a person named "Deron" who indicated that they could sell narcotics and firearms. PSR ⸀ 7. "Deron" was later identified by the CI to be Mr. Lathen.  Despite assertions otherwise, Mr. Lathen has never been accused of selling firearms.

The CI contacted Mr. Lathen on July 29, 2014, and arranged to purchase one-half of an ounce of methamphetamine on July 30, 2014. PSR ⸀ 7. Mr. Lathen remembers that when the CI contacted him, he referred to her as "Red." Not knowing how he initially met her, he remembers that she called and said that she had met him downtown and that she was looking for methamphetamine. Mr. Lathen refused to sell her methamphetamine and informed her that he did not deal it. She then called him back and informed him that she wanted to purchase crack cocaine from him. Again, Mr. Lathen informed her that he did not sell crack cocaine and ultimately hung up on her. She then called him back and said that she was pregnant, from Saint Louis, Missouri, and she was in California trying to find drugs so that she could make a start

to provide for her baby. Mr. Lathen felt for her and told her that he would look around for someone who could help her out.

After a few conversations, "Red" informed Mr. Lathen of how much cash she had and asked him how much she might be able to get for that amount. He was uncertain and promised to get back with her while encouraging her to "get out of the drug game." He informed her that he would try to help her out and reach out to some people he knew and get back to her.

On July 30, 2014, Mr. Lathen met with "Red" at the KFC restaurant at 1610 Jerrold Avenue in San Francisco. PSR ¶ 8. During the meeting, Mr. Lathen handed "Red" a bag with 13.6 grams of actual methamphetamine.

Afterwards, on August 7, 2014, "Red" again contacted Mr. Lathen and made arrangements to complete another sale. During that sale, "Red" was accompanied by an undercover ATF agent. She introduced the agent to Mr. Lathen and indicated that the agent would seek to continue drug transactions with Mr. Lathen because she was wanted to go back home to have her baby. Furthermore, she informed Mr. Lathen that because she was pregnant the police would not use her to trick him. Mr. Lathen expressed that this was not something that he typically did, and he was doing it to assist her with the baby. At the time, he sold her 54 grams of actual methamphetamine for $2000. PSR ¶ 9.

On August 14, 2014, Mr. Lathen was contacted by the undercover ATF agent whom he had met at the August 7 buy who expressed that he would like to purchase additional drugs from Mr. Lathen. Mr. Lathen indicated that he would be unable to set the price or availability of the drugs, as he was not the supplier and had to inquire of the supplier prior to any deal being completed. PSR ¶ 10. While one deal

Defendant's Sentencing Memorandum
15cr00443-WHA                                      3

1   was initially set up, Mr. Lathen did not complete the deal and instead further communications regarding

2   sales took place directly between the ATF agent and Mr. Lathen's supplier "Frank." PSR ¶ 10. After "Red"

3   was not involved in the transactions, while Mr. Lathen did have further conversations with the ATF agent,

4   Mr. Lathen did not engage in further delivery of methamphetamine.

5

6       Between August and December, "Red" would continue to reach out to Mr. Lathen to say hello and

7   give him updates on her pregnancy. Screen shots from his phone reveal that she texted him late in October

8   to let him know that she had returned to California and that she had missed speaking with him. None of

9   these conversations were noted by the agents in their investigation of the case, PSR ¶¶ 8-13, and indicate

10  a close relationship that Mr. Lathen had developed with the woman he knew as "Red."

11

12

13

14   

15

16

17

18

19

20

21

22

23

24

25  Images 1-2. Text messages sent from "Red" to Mr. Lathen.

26

27

28  Defendant's Sentencing Memorandum
    15cr00443-WHA                          4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







Images 3-6. Text messages sent from "Red" to Mr. Lathen.

Defendant's Sentencing Memorandum
15cr00443-WHA                    5







Images 7-10. Text messages sent from "Red" to Mr. Lathen.

Defendant's Sentencing Memorandum
15cr00443-WHA                                    6



Images 11-12. Text messages sent by "Red" to Mr. Lathen's phone.

When agents went to search Mr. Lathen's home on December 12, 2014, they found marijuana and scales with marijuana residue on them within his home—but they did not find any methamphetamine or indicia of additional methamphetamine sales. PSR ¶ 12. A search of Mr. Lathen's seized cellular phones and text messages revealed that Mr. Lathen had previously engaged in conversation setting the prices of marijuana, not methamphetamine.[1] PSR ¶ 13, 15. When questioned by the agents, Mr. Lathen readily admitted that he had previously sold marijuana. PSR ¶ 15.

---

[1] While the Court may harbor concerns that the conversation detailed in the PSR at ¶ 13 where mention of "12 oz 550" could refer to methamphetamine, it is highly unlikely based upon Mr. Lathen's last delivery of methamphetamine to the undercover agent. There, Mr. Lathen provided "54 grams of actual methamphetamine for $2000." PSR ¶ 9. Using conversion, 54 grams of methamphetamine would be the equivalent of approximately 1.9 ounces. Were this conversation about methamphetamine, 12 ounces of methamphetamine would be worth well over $12,000.

Defendant's Sentencing Memorandum
15cr00443-WHA                    7

## 1.2    . . . [And] the History and Characteristics of the Defendant.

Living in San Francisco for the entirety of his life, Mr. Lathen has a supportive family that cares for him greatly. PSR ¶ 47. He currently lives with his sister Latasha Lathen, a beautician. PSR ¶¶ 47, 51.

Growing up, Mr. Lathen was never aware of the struggles that his family faced in trying to raise him and his four sisters. PSR ¶¶ 47-48. Raised by his mother and father, he was reared with his siblings, his grandparents, and extended relatives. PSR ¶ 48.

While he avoided convictions throughout his youth, he was not untouched by the violence that surrounded his neighborhood.  Once, as a teenager, he experienced the trauma that was caused by being a near witness to a drive-by shooting that resulted in a death. PSR ¶ 48.

As he got older, he continued in school until he reached the 11th grade and remained active in sports until he could no longer participate due to his poor performance academically. PSR ¶ 58-59. He later received his GED in 2006 at the Community College of San Francisco. PSR ¶ 61.

After he left high school, Mr. Lathen had been employed for the majority of his life working in landscaping for Pacheco Brothers Landscaping in Hayward and Martina Landscaping in San Jose. While at Iron Worker School, he began working for the Iron Workers Union and worked for Viking Steel and Pacific Coast Steel. He is currently employed in two positions, and splits his time between working security at Crazy Horse and as a general laborer for a construction company at D & H Construction, Inc. in El Cerrito, California. PSR ¶¶ 62-63.

While Mr. Lathen currently has the support of all of his sisters, he is currently without the support of his parents. His father, Robert Lathen, passed away in 2013 following his death from a heart attack.

PSR ¶ 47. Mr. Lathen was 25 at the time. His mother passed away when Mr. Lathen was 27. PSR ¶ 47. A long time driver for MUNI, she suffered a stroke—one month after the search warrant was served at her home in this case—and then fell into a coma for eight months. She never regained consciousness and passed away shortly after Mr. Lathen was indicted.

## 1.3   The Need for the Sentence Imposed.

### 1.3.1   To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; To Afford Adequate Deterrence;

The requested sentence is significantly tailored to Mr. Lathen and, thus, reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and serves as an adequate deterrence to criminal conduct.

While a variance from the standard sentence imposed in this type of case, the sentence will be a specific deterrent to Mr. Lathen as the continued supervision he will incur while after serving his sentence will serve as a great hindrance on any temptation to continue in illegal activity.

### 1.3.2   To Protect the Public from Further Crimes of the Defendant; and

Mr. Lathen has never previously been convicted of any criminal activity. While on pre-trial supervision, Mr. Lathen committed no new criminal conduct. PSR ¶ 4. Rather, his issues primarily related to substance abuse. *Id.* He did have one instance for driving on a suspended license, but he cleared up the issue quickly. *Id.*

Mr. Lathen will have a lengthy period of time while on supervision following the conclusion of his case. This period of supervision with give the public the best opportunity to prevent Mr. Lathen from committing further offenses.

### 1.3.3 To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.

Mr. Lathen has received his GED and requires no education or training while in custody.  He additionally has no medical issues requiring treatment.

However, he has long been suffering from panic issues and substance abuse. PSR ⸹ 53-55. Since he was 16, he has been a daily user of marijuana. PSR ⸹ 54. He experimented with both cocaine and Ecstasy. PSR ⸹ 55. The arrest in this case and the supervision that he has been on as a result has been the primary deterrent to Mr. Lathan's continuing to abuse controlled substances.

Mr. Lathen's anxiety issues have only increased in the months since his mother's passing. He once suffered from a panic attack so fierce he had to the emergency room for fear that he was having a heart attack like his father. PSR ⸹ 53. He has greatly benefitted from the drug and mental health treatment he received through pre-trial services and he would benefit from similar counseling continuing when supervision continues after his sentencing. PSR ⸹ 53.

## 1.4    The Kinds of Sentences Available.

Here, the Court may impose any sentence up to 20 years imprisonment, lifetime years supervised release, five-years probation, a $1,000,000 fine, and a $100 special assessment for each count.

### 1.5 The Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant as Set Forth in the Guidelines

#### 1.5.1   Mr. Lathen's Proposed Guideline Calculations.

Base Offense Level, USSG § 2D1.1 ...................................................... 26
Safety Valve, USSG § 2D1.1(b)(17) ..................................................... -2
Acceptance of Responsibility, USSG § 3E1.1(a) & (b)..................... −3

Total Offense Level ............................................................................. 21
Criminal History Category .................................................................. I
Sentencing Guideline Range ........................................... 37-46 months

Government Recommendation ............................................. 57 months
Probation Officer Recommendation ................................... 20 months
Mr. Lathen's Recommendation ......................... 12 months and a day
............................................................... Or, five years probation

#### 1.5.2 The Court Should Adjust Downward Three-Levels for Acceptance of Responsibility.

Pursuant to U.S.S.G. § 3E1.1, the Court should depart three-levels because Mr. Lathen accepted responsibility for his involvement in the present offense.

#### 1.5.3 The Court Should Adjust Downward Two-Levels for Safety Valve

Pursuant to U.S.S.G. § 2D1.1(b)(17) and U.S.S.G. § 5C1.2, the Court should depart two-levels because Mr. Lathen provided the government with information he has concerning the offense.

#### 1.5.4 The Court Should Use the Base Offense Level for Methamphetamine (mix) Rather Than Methamphetamine (actual)

Mr. Lathen objects to the Sentencing Guidelines base offense level suggested by probation and argues that the sentence recommended by the government is disproportionally driven by lab tests

indicating the methamphetamine in this case qualified as methamphetamine (actual).  For reasons detailed below, undue reliance on the methamphetamine (actual) table effectively negates Mr. Lathen's specific circumstances of his case.  In order to avoid an unduly harsh sentence as compared to similarly situated defendants nationally, a different guideline is necessary.

Mr. Lathen is responsible for 67.6 grams of methamphetamine.  That quantity corresponds to a presumptive methamphetamine (mixture) Base Offense Level of 26.  Several months after the plea however, a DEA lab examined the methamphetamine and reported a purity exceeding 80%, triggering a methamphetamine (actual) Base Offense Level of 30.  The decision by the DEA to test purity added 24 months to the presumptive punishment, shifting the Guideline Range from 37-46 months to 57-71months.[2]

The question is whether a near-doubling of the punishment is warranted, either by the misconduct in this case, or by comparison to similar offenders nationally.  The answer is no.  A study of methamphetamine chemistry, dangers, and federal sentencing statistics shows that methamphetamine (actual) table unjustly penalizes Mr. Lathen, based solely upon drug purity treats these defendants dissimilarly than the majority of similarly situated offenders in our federal system.

### 1.5.4.1 Background Methamphetamine Guideline History

Initially, the Sentencing Guidelines treated 1 gram of methamphetamine as the equivalent of 2 grams of cocaine or 0.4 grams of heroin.[3]  In theory, this was a value judgment that 1 gram of

---

[2] *Compare* U.S.S.G. § 2D1.1(c)(8) *with* U.S.S.G. § 2D1.1(c)(11).

[3] Due to page restrictions, this memo summarizes the research detailed by the United States Sentencing Commission at "Methamphetamine, Final Report 1999," pages 7-13; available online at http://www.ussc.gov/sites/default/files/pdf/research/working-group-

methamphetamine was twice as dangerous as cocaine, but only 4/10 as harmful as the same weight of heroin.  Over years of persistent upward directives, methamphetamine punishments increased 2,500% relative to these other serious drugs.  Currently, 1 gram of methamphetamine (actual) is now considered the equivalent of 100 grams of cocaine or 20 grams of heroin. *See* U.S.S.G. § 2D1.1 Application Note 8(D) – Equivalency table. Studies demonstrate that heroin and cocaine users are 400% more likely and 160% more likely (respectively) to require an emergency room visit than comparable methamphetamine users.[4] Nevertheless, these unsound ratios remain in effect, and, as applied, the 67.6 g or methamphetamine (actual) attributable to Mr. Lathen is considered equal to the sale of 67,600 doses of cocaine or heroin.[5]

### 1.5.4.2 Methamphetamine (Actual) vs (Mix)

The upward trends in methamphetamine punishments began when Congress created a distinction between methamphetamine (mix) and methamphetamine (actual) for two flawed reasons.

### 1.5.4.3 Presumed Harmfulness of "Crystalline" Drugs

First, in the late 1980's, Congress formed a mistaken belief that crystalline drugs (crack and meth-actual) are much more addictive and dangerous than their chemically identical powder forms.[6] The Congressional belief that methamphetamine (actual) is worse than methamphetamine (mixture) was

---

reports/drugs/199911_Meth_Report.pdf.

[4] Dr. Paul Hofer, Ranking Drug Harms for Sentencing Policy," Johns Hopkins Department of Psychological and Brain Sciences, (May 2015); available online at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2612654 at page 15.

[5] Estimated using 6760 g of cocaine multiplied by 10 doses per gram. *See* http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Drug_Topics/200205_RtC_Cocaine_Sentencing_Policy/ch2.pdf and 1352 g of heroin where each gram produces 50 doses.  *See United States v. Polanco*, 634 F.3d 39 (1st Cir. 2011)(in which the United States presented evidence that a single gram of heroin yields 50 doses).

[6] *1999 Report. Supra Note 3 at 7-13.*

Defendant's Sentencing Memorandum
15cr00443-WHA                          13

quickly determined to be wrong.  By 1999, the Sentencing Commission had already determined and reported to Congress:

> Methamphetamine-mix and Methamphetamine-actual are not readily distinguishable, requiring a laboratory analysis to determine the purity of the drug."[7]

and

> Methamphetamine-Actual and –mix are not different forms of substance but rather are [merely] alternative methods of measuring the severity of the offense …"[8]

Indeed, although methamphetamine in either form is chemically identical, mixing agents are not. The result is that use of methamphetamine (actual) is ***significantly less dangerous*** than use of methamphetamine (mixture).  About ten years ago, the United States and Mexico both clamped down on the sale of pseudoephedrine, resulting in a shift from "home-made" methamphetamine to methamphetamine made in labs.[9]  As the availability of "home-made" methamphetamine fell, the average purity of methamphetamine nationwide rose from about 30% in 1999[10] to 93% in 2013[11].  The change towards purer but "cleaner" methamphetamine meant users experienced ***fewer*** harmful effects of drug use.  A Department of Justice study found that as purity levels rose, meth-related emergency department

---

[7] *Id.* at 15.

[8] *Id.* at 14, Footnote 40.

[9] Combat Methamphetamine Epidemic Act of 2005, Pub. L. No. 109-177, tit. VII, 120 Stat. 256 (2006); James J. Cunningham et al., *Mexico's Precursor Chemical Controls: Emergence of Less Potent Types of Methamphetamine in the United States*, 129 Drug & Alcohol Dependence 125, 126 (2013) *available at* http://www.ncbi.nlm.nih.gov/pubmed/23127541; Nat'l Drug Intelligence Ctr., U.S. Dep't of Justice, Publ'n No. 2010-Q0317-001, *National Drug Threat Assessment 2011* 23 (2011), *available at* https://www.justice.gov/archive/ndic/pubs44/44849/44849p.pdf.

[10] 1999 Commission Report at Footnote 33.

[11] DEA Intelligence Division Report chart of 2013, available online at https://www.drugabuse.gov/sites/default/files/files/cewg_january_2013_vol1_508.pdf

visits over a sample 3-year time-frame dropped 41.5% while methamphetamine-related in-patient treatment admissions dropped 29.9%.[12]

### 1.5.4.4 As a Presumptive Indication of Status in the Drug Chain

The second flawed justification for the distinction between methamphetamine (mix) and (actual) was the presumption that "a defendant [who] is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs."  U.S.S.G. § 2D1.1., cmt. n.27 (c).This presumption depended upon the idea that each successive layer of middlemen would dilute ("step-on") methamphetamine in order to increase the quantity for re-sale, resulting in increasingly diluted drugs as the drugs journeyed to the eventual end user.  This has never been shown to be the case. Indeed, as noted above, it is now a fact that across the United States and across all levels, seized methamphetamine averages 93% purity, meaning that the "average" methamphetamine bought by a user on the streets today incorrectly paints him as a presumptive kingpin.  Furthermore, as purity climbed, price plummeted 377% from $306.49 per gram to only $81.28 per gram. *See* Exhibit A. When the average purity of methamphetamine is 93%, and all methamphetamine over 80% purity is considered "actual," focusing on methamphetamine purity utterly fails to distinguish culpability among drug distributors.

### 1.5.4.5 Testing Performed in a Minority of Cases

The Sentencing Commission, as early as 1999, identified another problem with purity analysis – selective testing.  The Commission reported:

---

[12] Nat'l Drug Intelligence Ctr., U.S. Dep't of Justice, Publ'n No. 2010-Q0317-001, *National Drug Threat Assessment 2011* 23 (2011), *available at* http://www.justice.gov/archive/ndic/pubs44/44849/44849p.pdf.

Because of the high purity level of street-level methamphetamine and the higher penalties associated with meth-actual, nearly all cases in which an analysis of drug purity is conducted theoretically should be sentenced using the actual quantity of pure drug contained in the mixture of the substance… It is notable, however, that only 36.8 percent of methamphetamine cases (excluding Ice) are sentenced under the meth-act.[13]

Today, it is almost unheard of for tested methamphetamine to be less than 80% pure (the cut-off for determining what is "actual" meth).  Thus, the presence of the lab report in this case results in an arbitrary re-structuring of the Guidelines relative to other similarly situated defendants. Current statistics showing the number of defendants sentenced for mixture versus actual methamphetamine could not be found in the USSC's statistical yearbooks.  If the ratio is anywhere near what it was in the past however, then methamphetamine defendants are facing a seriously disparate sentencing problem.  It appears that the majority of offenders are being punished using the methamphetamine (mixture) guideline, not because of any factual differences between their cases and this one, but simply because drugs are sent to the lab for testing infrequently or selectively.  The effect is that by submitting the drugs for testing, the DEA artificially equated him to defendants across the country with dealers caught with much more substantial quantities of drugs (500g-1.5kg of methamphetamine – mixture) whose drugs were not selected for testing).

As one federal judge who has stopped placing weight on purity explained:

I find that there is no empirical data or study to suggest that actual purity should be punished more severely by an arbitrary increase of the four levels in this case or at the higher level. It seems to be black box science, as best I can determine. I probably would not allow it under *Daubert*, based on what I know at present. It seems to be contrary to any empirical evidence, and really undermines Section 3553(a), as it does create an unwarranted disparity. It seems to me that this is not even a

---

[13] *See* 1999 Report at Page 15.

rough approximation to comply with 3553, and is not really based on any consultation or criminal justice goals or data.

*United States v. Santillanes*, 274 Fed.Appx. 718 (D.N.M. Sept. 19, 2009).

In sum, the purity analysis has no value when evaluating culpability, arbitrarily distorts the seriousness of this offense relative to other methamphetamine cases, treats similarly situated defendants dissimilarly, and undermines respect for the law by selectively punishing some defendants more harshly for reasons unrelated to their own actions or conduct (e.g. which agency effected their arrest).   In comparison to other drugs, the methamphetamine (actual) guideline also undermines respect for the law by treating a person like Mr. Lathen as if he was a high-level kingpin of a cocaine or heroin cartel when the empirical evidence contradicts such a notion.

## 1.6     Any Pertinent Policy Statement.

Addressed above.

## 1.7     Unwarranted Sentencing Disparity.

Finally, Mr. Lathen's initial involvement in this offense differs from others similarly situated. He is requesting the Court impose a downward variance for imperfect entrapment to encompass the differences between himself and other defendants who were involved in the sale of methamphetamine.

### 1.7.1. Entrapment Generally

The entrapment defense is a judicially-created limitation on governmental activity. *United States v. Russell*, 411 U.S. 423, 430-35 (1972). It was first recognized by the Supreme Court in *Sorrells v. United States*, 287 U.S. 435 (1932), and has been adopted, with slight variations, in every federal circuit. *See United States v. Tom*, 330 F.3d 83, 89-91 (1st Cir. 2003); *United States v. Brand*, 467 F.3d 179, 189- 195 (2d Cir.

2006); *United States v. Fedroff*, 874 F.2d 178 (3d Cir. 1989); *United States v. Sligh*, 142 F.3d 761 (4th Cir. 1998); *United States v. Wise*, 221 F.3d 140, 154-56 (5th Cir. 2000); *United States v. Kussmaul*, 987 F.2d 345, 348 (6th Cir. 1993); *United States v. Hollingsworth*, 27 F.3d 1196, 1198 (7th Cir. 1994); *United States v. Brooks*, 215 F.3d 842 (8th Cir. 2000); *United States v. Poehlman*, 217 F.3d 692, 697 (9th Cir. 2000); *United States v. Garcia*, 182 F.3d 1165, 1168-69 (10th Cir. 1999); *United States v. Francis*, 131 F.3d 1452, 1455-56 (11th Cir. 1997); *United States v. McKinley*, 70 F.3d 1307, 1311-14 (D.C. Cir. 1995). The defense is premised on "the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense but was induced to commit them by the Government." *Russell*, 411 U.S. at 435.

Entrapment is a complete defense to a criminal charge, on the theory that "Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548 (1992).

A valid entrapment defense has two related elements: (1) government inducement of the crime, and (2) the defendant's lack of predisposition to engage in the criminal conduct. *Mathews v. United States*, 485 U.S. 58, 63 (1988). Of the two elements, predisposition is by far the more important.

### 1.7.2 Inducement

The most basic definition of inducement is "solicitation *plus* some overreaching or improper conduct on the part of the government." *United States v. Hsu*, 364 F.3d 192, 200 (4th Cir. 2004)(emphasis in original). *See also Poehlman*, 217 F.3d at 702-03 (defining inducement as "anything that materially alters the balance of risks and rewards bearing on the defendant's decision whether to commit the offense, so as to increase the likelihood that he will engage in the particular criminal conduct."); *United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir. 1986) ("Inducement may be defined as government conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense.").

Solicitation, or the creation of an opportunity to engage in criminal conduct, alone is not sufficient to establish inducement. *Hsu*, 364 F.3d at 199; *United States v. Pratt*, 913 F.2d 982, 989 (1st Cir. 1990).

Inducement is the threshold issue in the entrapment defense. Mere solicitation to commit a crime is not inducement. *Sorrells v. United States*, 287 U.S. 435, 451 (1932). Nor does the government's use of artifice, stratagem, pretense, or deceit establish inducement. *Id.* at 441. Rather, inducement requires a showing of at least persuasion or mild coercion, *United States v. Nations*, 764 F.2d 1073, 1080 (5th Cir. 1985); pleas based on need, sympathy, or friendship, *ibid.*; or extraordinary promises of the sort "that would blind the ordinary person to his legal duties," *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991). *See also United States v. Kelly*, 748 F.2d 691, 698 (D.C. Cir. 1984) (inducement shown only if government's behavior was such that "a law-abiding citizen's will to obey the law could have been overborne"); *United States v. Johnson*, 872 F.2d 612, 620 (5th Cir. 1989) (inducement shown if government created "a substantial risk that an offense would be committed by a person other than one ready to commit it").

### 1.7.3 Predisposition

Predisposition" is defined generally as "a defendant's inclination to engage in the illegal activity for which he has been charged, i.e., that he is ready and willing to commit the crime." *United States v. LaRizza*, 72 F.3d 775, 778 (9th Cir. 1995); *Ortiz*, 804 F.2d at 1165. Predisposition must be measured *before* any initial exposure to governmental suggestion, rather than at the time of the offense. *Brooks*, 215 F.3d at 846; *Fedroff*, 874 F.2d at 182. Predisposition is not limited to crimes specifically contemplated by the defendant, but also encompasses decisions to commit crimes that are the product of the defendant's own preference

Defendant's Sentencing Memorandum
15cr00443-WHA                                    19

and not the product of government persuasion. *United States v. Ramos*, 462 F.3d 329, 334-35 (4th Cir. 2006).

The First, Third, Sixth, Seventh, and Ninth, employ a five factor predisposition test which directs the fact-finder to consider: (1) the character or reputation of the defendant; (2) whether the government made the initial suggestion of criminal activity; (3) whether the defendant engaged in the activity for profit; (4) whether the defendant showed any reluctance; and (5) the nature of the government's inducement. *United States v. Gamache*, 156 F.3d 1, 9-10 (1st Cir. 1998); *United States v. Wright,* 921 F.2d 42, 45 (3d Cir. 1990); *United States v. Barger*, 931 F.2d 359, 366 (6th Cir. 1991); *United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999); *United States v. Gurolla*, 333 F.3d 944, 955 (9th Cir. 2003).

A defendant who claims that he was entrapped opens himself to "an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." *Sorrells v. United States*, 287 U.S. 435, 451 (1932). Thus, predisposition may be shown by evidence of other crimes that might not otherwise be admissible. And, although *Jacobson*'s focus on the government's duty to show that the defendant was disposed to commit the crime "prior to first being approached by [g]overnment agents" (*Jacobson v. United States*, 503 U.S. 540, 549 (1992)) seems to cast doubt on the admissibility of evidence of subsequent crimes to show predisposition (as in *United States v. Posner*, 865 F.2d 654 (5th Cir. 1989);*United States v. Warren*, 453 F.2d 738 (2d Cir.), *cert. denied*, 406 U.S. 944 (1972)), it is fair to argue that such evidence is admissible under *Jacobson* as long as the subsequent crimes were "independent and not the product of the attention that the [g]overnment had directed" at the defendant (503 U.S. at 550).

### 1.7.4. Imperfect Entrapment

Where a defendant has been subjected to aggressive encouragement of wrongdoing by a government agent, but is unable to make a complete defense for entrapment, he may seek a downward departure at sentencing for imperfect entrapment. *See United States v. Bala*, 236 F.3d 87, 90-92 (2d Cir. 2000); *United States v. Warren*, 16 F.3d 247 (8th Cir. 1994); *United States v. McClelland*, 72 F.3d 717 (9th Cir. 1995).

Here, Mr. Lathen fails to establish a perfect defense of entrapment because he admittedly has engaged in the sale of marijuana to others. PSR ¶ 13, 15. These marijuana sales reveal he has a predisposition to engage in the possession of controlled substances for the distribution to others. However, all the other requirements for entrapment could be found. He was approached by a pregnant woman who repeatedly asked him to engage in the sale of methamphetamine to assist her to preparing to take care of her baby. PSR ¶¶ 9-13. She had to repeatedly ask Mr. Lathen to engage in the sale and he asked her on multiple occasions to "get out of the game." Furthermore, the fact that she continued to have conversations with Mr. Lathen after the sales had continued indicated that they had grown quite close and she had an emotional sway over him. Finally, and most tellingly, Mr. Lathen did not engage in any other sales, though he was requested to, after "Red" was no longer in the picture. PSR ¶¶ 9-13. Taken as a whole, the totality of circumstances show that while Mr. Lathen was predisposed to engage in the sale of one controlled substance – marijuana- he was not similarly so with methamphetamine. It was only after he was induced to do so by a confidential informant he had felt protective toward did he do so. As a result, he should receive a variance in his sentence for the entrapment, imperfect as it might have been.

## 1.8    Restitution.

The parties agree that Mr. Lathen should not pay restitution or a fine.

## 2.    Conclusion

The facts before the Court establish compelling reasons to impose a sentence below the low-end the Guideline range. Accordingly, Mr. Lathen asks the Court to sentence him to a term of 12-months and one day, or, in the alternative, five-years in probation.

Respectfully submitted,
STEVEN G. KALAR
Federal Public Defender

Dated:  August 17, 2016                    */s/ Candis Mitchell*
CANDIS MITCHELL
Attorney for Defendant